1
2
3
4
5
6

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

7   ABDOL ALI OMAR,

Petitioner,

8

9   v.

10  CRAIG KOENIG, Warden,

Respondent.

Case No. 20-cv-08228-SI (PR)

**ORDER DENYING HABEAS PETITION**

Re: Dkt. No. 1

## INTRODUCTION

Abdol Ali Omar filed this *pro se* action for a writ of habeas corpus under 28 U.S.C. § 2254 to challenge his conviction from Alameda County Superior Court for first degree murder. The court issued an order to show cause why the petition for writ of habeas corpus should not be granted, respondent filed an answer, and Omar filed a traverse. For the reasons discussed below, the petition for writ of habeas corpus will be DENIED.

## BACKGROUND

The California Court of Appeal described the events leading to Omar's conviction as follows: The charges filed against Omar arose from a November 30, 2014 incident at a convenience store owned by Omar's relative. *People v. Omar*, No. A151707, 2019 WL 2635578, at *1 (Cal. Ct. App. June 26, 2019, as modified on June 27, 2019, review denied on Sept. 25, 2019). On the day of the killing, Omar, armed with a knife, went to the store where he saw the victim R.P.[1] *Id.* After

_____

[1] Consistent with the California Court of Appeal's opinion and for privacy reasons, the court will refer to the victim by either her initials or as "the victim," and to certain witnesses by their first name and last initial. *See Omar*, 2019 WL 2635578, at *1, fn. 2.

United States District Court
Northern District of California

they spoke for a while, the victim walked away. *Id.* When she returned, Omar started to punch her and then drew his knife and stabbed her in her chest, fatally wounding her; the victim also sustained lesser wounds to her breast and abdomen, along with several cuts and abrasions identified as defensive wounds. *Id.*

The California Court of Appeal described the evidence presented at trial:

**A. The People's Case**

The People's witnesses testified concerning the circumstances of the relationship between the defendant and the victim, the incident that led to the victim's death, and the aftermath of the killing.

Before the killing, defendant and the victim had been in a "volatile" relationship for about a year. Defendant and the victim had been arguing a lot and the victim had talked about ending the relationship several times. While defendant "could be jealous," they apparently had a "good relationship." They had argued a day or two before the murder, but it was believed they were still together the day of the killing.

On the day of the killing, the victim, defendant's relative, and the victim's mother were in the convenience store. Defendant's relative and the victim's mother had been dating since 2006 and defendant's relative had helped raise the victim. Surveillance cameras captured the events and videos (no audio) were played for the jury. Defendant walked up to the victim at the back of the store and they appeared to speak. No one overheard what was said. The victim walked outside for a moment and, when she returned, defendant started to punch her. He stabbed the victim in her upper chest area. The victim also sustained less serious stab wounds in her breast and abdomen, along with several cuts and abrasions, identified as defensive wounds. After defendant stabbed the victim, defendant's relative and the victim's mother grabbed the knife and threw it to the side. Defendant's relative "was shocked" that defendant had stabbed the victim, because "[t]his [is] not him, you know."

After being stabbed, the victim ran out of the store and collapsed on the street. When two police officers arrived, they found her in the backseat of a van. The victim was bleeding from her mouth, nose, and a large wound on her upper chest area; she was not breathing. One police officer administered CPR for two to three minutes while the officer's body camera recorded the attempt to resuscitate the victim. The victim was later pronounced dead at the scene. The cause of death was the stab wound to her chest that pierced her lung.

As the police and witnesses were tending to the victim, defendant waited outside the convenience store. Roberto M., who lived above the store, called 911. He was helping the victim when he heard another man pointing at defendant and yelling, "[t]here's the dude that did it." Roberto M. saw defendant standing approximately five feet away on the sidewalk, looking at the victim. Roberto M. thought it was odd that defendant was just standing there "focused" on the victim. At some point, the man walked over to defendant and grabbed him. Defendant "just kind of stood there

United States District Court
Northern District of California

"super still" and did not say anything.  At some point, Roberto M. saw defendant walk 20 feet down the street and pull out his cell phone.  Defendant then walked back to where he had been standing.  Defendant was not angry or crying, had "no expression," and showed "no emotion."  Throughout the entire time Roberto M. observed defendant, defendant was "neutral" and "flat," without emotional variance.

As one police officer was giving CPR to the victim, several people approached another officer and pointed out defendant as the person who stabbed the victim.  Defendant, with his hands out, palms up and close together, as if requesting to be handcuffed, approached the other officer.  After noticing blood on defendant's hands, the officer handcuffed defendant and placed him in the back of the patrol car.  The jury heard conflicting evidence concerning what defendant said as he approached the officer.  Ethel D. testified that defendant said, "I'm a murderer. I murdered her."  The officer's personal recording device recorded defendant stating, "I did that. I'm the one who did it."  The recording was played for the jury.

The police recovered defendant's cell phone.  The call log and text messages taken from the phone were admitted into evidence.  During the two-hour period before the killing, there were text exchanges between defendant and the victim and one telephone call between them that last approximately five minutes.  Defendant's text messages included "declarations of love" and pleas to work things out, as well as text messages that "[p]ay back is coming hard," the victim should change her mind before it is "too late," and that defendant "will make all go away soon.  You will go with me. No one will have you."

## B. Defense Case

Defendant testified on his behalf concerning the circumstances of his relationship with the victim, the incident that led to the victim's death, and the aftermath of the killing.

Before the killing, the victim's mother had proposed an arranged marriage between the then 31-year-old defendant and 15-year-old victim.  By that time defendant had known the victim for several years, the victim had dated six or seven older men, and defendant was separated from his wife who lived in Yemen.  Defendant and the victim developed a friendship and he thought they were committed to marriage.  Defendant took care of the victim and "gave her everything."  He took the victim to school, they went on vacations together, he sent her to Laos with her mother, and he bought her expensive gifts (a car) and jewelry (an engagement ring).

When the victim turned 18, they went to a mosque and were married in a religious ceremony.  The relationship became intimate after the victim turned 18.  The marriage was not "legally recognized," but they planned to legally marry the month after the killing.  Defendant did not invite any family members to the mosque ceremony because the victim's mother had requested a $20,000 dowry and he did not yet have the money to pay it.  Defendant claimed that, while he was faithful to the victim, the victim was not faithful to him.  Defendant described three occasions when he caught the victim being unfaithful.  After the second incident, they reconciled with the victim apologizing and assuring him that she loved him.

3

On Monday, November 24, a month before the planned marriage, defendant received a call and was told about a social media posting in which the victim was seen kissing a man. By this time, defendant was referring to the victim as his wife, and his family and friends considered the couple married. The defense introduced photos of the victim kissing a man, who referred to the victim as his wife. After seeing the victim with another man, defendant was "devastated" and angry, and he called the victim to confront her. At first, the victim denied she had been with another man, and she stated she still planned to marry defendant. When defendant sent the photograph to the victim, she hung up on him. Defendant was so upset that he closed his store early, and he went to the convenience store to inform his relative and the victim's mother that the victim was cheating on him. Defendant's relative assured defendant he would talk to the victim's mother and they would "figure this out." Defendant went home "very sick;" he was "mentally sick" and "hurt." Defendant tried to contact the victim, but she blocked his texts and telephone calls.

On Tuesday, November 25, the victim went to the convenience store and dropped off the keys to the car defendant had bought her, defendant's debit card, defendant's insulin, and jewelry, including the engagement ring. The victim told defendant's relative to tell defendant that she did not want anything more to do with defendant. Defendant talked to the victim and asked her why she was ending the relationship. The victim said "this time it's for good. I want to be alone[.] I don't want to be bothered by anyone." Defendant tried to get the victim to tell him how long she had been cheating on him, but she denied being unfaithful.

Defendant and the victim next spoke on Thursday, November 27. Defendant again closed his store early and went to the victim's home, where she was asleep in bed. Defendant told her he loved her, still wanted to marry her, and asked her to be honest with him. The victim said, "it was just pictures," and she and defendant ended up kissing and "in bed together." Defendant took a shower, and when he came back the victim was on the telephone talking to someone. The victim told him to leave and that he was not welcome in her home anymore. She said, "I still don't want to be with you." Defendant then drove to the convenience store and informed the victim's mother that the victim was cheating on him. Defendant was "very stressed out" and "out of [his] mind," and he did not know what to think. Defendant loved the victim "more than anything in the world" and "always forgave her." Defendant was afraid that this time it might be different because the victim had openly called herself the wife of another man on social media. This made defendant believe that the victim did not care if he found out that she was cheating on him.

Defendant did not talk to the victim again until the evening of Saturday, November 29, when the victim accepted his telephone call. Defendant offered to bring her lottery tickets and her favorite food. The victim told him she would be asleep, and he should come to the convenience store the next day. Defendant went to the victim's home, with flowers, food, and lottery tickets. When he arrived, the victim's brother said the victim was with her sister in another city. Defendant's calls to the victim went unanswered. Defendant then drove around looking for the victim before returning to the victim's home. Defendant saw a car pull up and the victim get out. The victim approached the driver's side window and "passionately" kissed the man's

mouth.  The man was the same person defendant had seen in the social media photograph.  Defendant first "froze," and then he screamed at the victim, who ran to her apartment and locked herself inside.  Defendant yelled outside the victim's home for fifteen minutes, finally leaving after the neighbors started yelling at him.  When defendant got home, he cried for an hour.  His night-long texts and telephone calls to the victim went unanswered.

Defendant testified concerning the texts and telephone calls he made to the victim on Sunday, November 30, the day of the killing.  After seeing the victim with another man, defendant changed the victim's contact listing from "my baby" to "ho [sic]."  The victim answered one telephone call, which lasted one minute and 46 seconds.  When defendant said he had seen the victim cheating and wanted to know how long she had been cheating, the victim replied, "It's none of your f******* business, leave me the f*** alone."  The victim then hung up, leaving defendant "angry and hurt."  Defendant further indicated that he had deleted some text messages because they were "old."  He had written that he loved her and forgave her.  He acknowledged that some of the texts sounded threatening, but he claimed they were not intended to be so; he just meant that no one was going to take his place because they loved each other, what she had done was just sex, and they would get back together.

Less than an hour before the killing, defendant called the victim and they spoke for five minutes.  Defendant again asked her to tell him about the other man.  The victim said she had met the other man on social media, they had been dating for a year, they were engaged to be married, her family knew about him, and she no longer planned to marry defendant.  The victim had wanted to break up with him sooner, but felt sorry for him.  After he hung up, defendant started to cry.  He went to his kitchen and picked up a knife.  He believed his life was over.

After placing the knife in his jacket pocket, defendant called his brother and asked to be taken to the convenience store.  At that point, defendant wanted to hurt the victim and himself because he thought that was the only way they could be together.  He thought he could fix the situation because she would "fear" him; she would be "scared;" and she would not cheat on him or leave him.  He had "run out of options;" he had "nothing else;" he had "begged her, cried and did everything" he could, but she would not accept him.  He conceded that his thoughts and actions made no sense: "It was crazy and stupid."  At the time, however, it had "made a lot of sense ... on that particular day," but not "now and after that."  Before the killing, he was very sick, shaky, and pale, he threw up, and he had not taken his insulin or slept for four days.

Defendant's brother dropped defendant off a few blocks from the convenience store so that defendant could "clear his head."  When defendant arrived at the store, he kept the knife in his pocket because he wanted the victim to take him back.  The victim was behind the counter and defendant's "crazy fantasy" about hurting the victim and himself "vanished."  Instead, he wanted to talk to her, wanted her back, and did not want to hurt her.  He tapped her on the shoulder and asked her to move so he could get by her.  He asked her to lie to him and say that the other man did not touch her last night.  The victim replied, "Yes, he did. It's none of your f******* business bitch, die."  She grabbed the garbage and walked out.  Defendant felt "sick" and

5

grabbed a bottle of water because he could not breathe.  He was planning on walking outside, but when the victim came back and walked towards him he "exploded," pulled out the knife, and stabbed her.  Defendant claimed that at that time nothing was going through his head, he did not know what he was doing, he was "mad and angry and hurt."  While he sobbed on the witness stand, defendant admitted he killed the victim, but he could not say why.  After seeing the surveillance video of the killing in the courtroom, defendant stated he felt like he had seen a monster, it was not the person that he was, it was out of character, and it was not him "on that video."  He denied he had ever hurt the victim before, and he had never physically struck a woman.

On cross-examination, defendant testified he "did not remember" stabbing the victim, and he did not feel the knife go into her body.  He recalled his brother yelling that defendant had stabbed the victim, but could not remember doing so because he was "confused and shaky" and "in shock."  After the stabbing, defendant pulled out his telephone to call 911, but heard sirens and called his brother instead.  Defendant told his brother that he had "hurt" the victim.  Defendant denied saying at the scene that he had "murdered" the victim.  Defendant thought he had only injured the victim and did not learn that she died until later at the police station.  He denied that he had killed the victim on purpose, he knew the act of stabbing someone with a knife in the chest was likely to kill the person, and he repeated that he only wanted to hurt her.  Following multiple questions, defendant repeatedly said he did not intend to kill the victim.

*Id.* at *1-4 (footnotes omitted).

Omar was convicted by a jury of first degree murder.  *Id.* at *1.  The deadly weapon enhancement allegation was found true.  *Id.*  On June 20, 2017, Omar was sentenced to a total of 26 years in state prison.  2CT 320.[2]  Omar appealed.  His conviction was affirmed by the California Court of Appeal, and his petition for review was denied by the California Supreme Court.  He then filed this action.  The matter is now ready for decision.


## JURISDICTION AND VENUE

This court has subject matter jurisdiction over this action for a writ of habeas corpus under 28 U.S.C. § 2254.  28 U.S.C. § 1331.  This action is in the proper venue because the petition concerns the conviction and sentence of a person convicted in Alameda County, California, which is within this judicial district.  28 U.S.C. §§ 84, 2241(d).

---

[2] The Clerk's Transcript ("CT") and Reporter's Transcript ("RT") have been lodged as Respondent's Exhibits 1A-1B and 2A-2B respectively.  The number preceding CT or RT refers to the volume, and the number following CT or RT refers to the page.

**LEGAL STANDARD**

This court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") amended § 2254 to impose new restrictions on federal habeas review. A petition may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." *Williams (Terry) v. Taylor*, 529 U.S. 362, 412-13 (2000). "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id*. at 413. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id*. at 411. "A federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was 'objectively unreasonable.'" *Id*. at 409.

The state-court decision to which § 2254(d) applies is the "last reasoned decision" of the state court. *Ylst v. Nunnemaker*, 501 U.S. 797, 803-04 (1991). When confronted with an unexplained decision from the last state court to have been presented with the issue, "the federal court should 'look through' the unexplained decision to the last related state-court decision that does provide a relevant rationale. It should then presume that the unexplained decision adopted the same

reasoning." *Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018).

Section 2254(d) generally applies to unexplained as well as reasoned decisions. "When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Harrington v. Richter*, 562 U.S. 86, 99 (2011). When the state court has denied a federal constitutional claim on the merits without explanation, and there is no reasoned decision to look through to, the federal habeas court "must determine what arguments or theories supported or . . . could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the U.S. Supreme] Court." *Id.* at 102.

## DISCUSSION

A.   Jury Instructions

Omar contends that the trial court committed two prejudicial errors when instructing the jury: (1) it failed to instruct *sua sponte* on the lesser included offense of implied malice as a theory of second degree murder and voluntary manslaughter; and (2) it failed to properly instruct the jury on the requirement of reaching unanimous agreement on the degree of murder. Docket No. 1 at 6-15.[3]

1.   The Evidence And Instructions At Trial

The issue at trial was not whether Omar killed the victim, but whether the killing amounted to first degree murder, second degree murder, or voluntary manslaughter. The defense theory was that Omar did not intend to kill the victim, but intended to scare her into taking him back. 2RT 422. As defense counsel stated in closing arguments: "So yes, he made some threats, but it wasn't a consistent message because he didn't want to kill her. He wanted to scare her. He wanted to do whatever he needed . . . to keep her with him." 2RT 422. Omar contends that after closing

---

[3] Page number citations refer to those assigned by the court's electronic case management filing system and not those assigned by the parties.

arguments, the court should have instructed *sua sponte*, on the implied malice theory of second degree murder as a lesser included offense because the issue of intent was the main issue presented at trial.  Docket No. 1 at 6.

After closing arguments and using the CALJIC pattern instructions, the trial court instructed the jurors on murder in the first degree, murder in the second degree, and voluntary manslaughter, as well as general instructions applicable to their deliberations.  2CT 290-310.  The trial court defined concurrence of act and specific intent (CALJIC 3.31), murder (CALJIC 8.10), and malice aforethought (CALJIC 8.11), and then it provided the following pertinent CALJIC instructions on the theories of murder in this order:

CALJIC 8.20

Deliberate And Premeditated Murder
(2008 Revision)

All murder which is perpetrated by any kind of willful, deliberate and premeditated killing with express malice aforethought is murder of the first degree. . . .  [¶]  If you find that the killing was preceded and accompanied by a clear, deliberate intent on the part of the defendant to kill, which was the result of deliberation and premeditation, so that it must have been formed upon preexisting reflection and not under a sudden heat of passion or other condition precluding the idea of deliberation, it is murder of the first degree. . . .

CALJIC 8.30

Unpremeditated Murder Of The Second Degree

Murder of the second degree is the unlawful killing of a human being with malice aforethought when the perpetrator intended unlawfully to kill a human being but the evidence is insufficient to prove deliberation and premeditation.

CALJIC 8.70

Duty Of Jury As To Degree Of Murder

Murder is classified into two degrees.  If you should find the defendant guilty of murder, you must determine and state in your verdict whether you find the murder to be of the first or second degree.

CALJIC 8.71

Doubt Whether First Or Second Degree Murder

If you are convinced beyond a reasonable doubt and unanimously agree that the crime of murder has been committed by the defendant, but you unanimously agree that you have a reasonable doubt whether the murder was of the first or second degree, you must give the defendant the benefit of that doubt and return a verdict fixing the murder as of the second degree.

CALJIC 8.40
(2004 Revision)

Voluntary Manslaughter - Defined

Every person who unlawfully kills another human being without malice aforethought but with an intent to kill, is guilty of voluntary manslaughter in violation of Penal Code Section 192(a).  [¶]  There is no malice aforethought if the killing occurred upon a sudden quarrel or heat of passion.  [¶]  In order to prove this crime, each of the following elements must be proved: [¶] 1. A human being was killed; [¶] 2. The killing was unlawful; and  [¶]  3. The perpetrator of the killing intended to kill the alleged victim; and  [¶]  4. The perpetrator's conduct resulted in the unlawful killing.

2CT 293-296 (paragraph breaks added).  The jury was also given instructions that pertained to sudden quarrel or heat of passion and provocation, and defined the heat of passion which could reduce a homicide to manslaughter to be "such a passion as naturally would be aroused in the mind of an ordinarily reasonable person in the same circumstances."  2CT 297-298 (CALJIC 8.42).

The instructions also distinguished murder and manslaughter as follows: "murder requires malice while manslaughter does not; and that "to establish that a killing is murder and not manslaughter, the burden is on the People to prove beyond a reasonable doubt each of the elements of murder."  2CT 300 (CALJIC 8.50).  The instructions specified what to do if the jury had reasonable doubt whether the crime is murder and manslaughter (CALJIC 8.72), and stressed that the jury must agree unanimously as to whether he is guilty of murder in the first/second degree of murder or voluntary manslaughter (CALJIC 8.74), stating as follows:

CALJIC 8.72

Doubt Whether Murder or Manslaughter

If you are convinced beyond a reasonable doubt and unanimously agree that the killing was unlawful, but you unanimously agree that you have a reasonable doubt

whether the crime is murder or manslaughter, you must give the defendant the benefit of that doubt and find it to be manslaughter rather than murder.

CALJIC 8.74
(2009 Revision)

Unanimous Agreement As To Offense – First or Second Degree Murder Or Manslaughter

Before you may return a verdict in this case, you must agree unanimously not only as to whether the defendant is guilty or not guilty, but also, if you find him guilty of an unlawful killing, you must agree unanimously as to whether he is guilty of murder of the first degree or murder of the second degree or voluntary manslaughter. *However, you are not required to agree unanimously on the theory of guilt.*

CALJIC 17.12

Jury May Return Partial Verdict – Non-Homicide – Express Acquittal – First

If you are not satisfied beyond a reasonable doubt that a defendant is guilty of the crime in Count One, and you unanimously so find, you may convict him of any lesser crime provided that you are satisfied beyond a reasonable doubt that he is guilty of that crime. [¶] You will be provided with guilty and not guilty verdict forms for the crime charged in Count One, murder, and the lesser crime of that Count. [¶] The crime of voluntary manslaughter is a lesser crime to that charged in Count One. [¶] Thus, you are to determine whether defendant is guilty or not guilty of the crime charged in Count One, or of any lesser crime(s). In doing so, you have discretion to choose the order in which you evaluate each crime and consider the evidence pertaining to it. You may find it to be productive to consider and reach tentative conclusions on all charges and lesser crimes before reaching any final verdict. . . .

2CT 301, 303 (emphasis added). And another instruction explained circumstances to consider while each juror deliberated; that the People and Omar were "entitled to the individual opinion of each juror"; and that each juror must decide the case for themselves "but should do so only after discussing the evidence and instructions with the other jurors." 2CT 304 (CALJIC 17.40). Finally, the jurors were instructed to retire to the jury deliberation room, and to remember that, in order to reach a verdict, "all twelve jurors must agree to the decision." 2CT 310 (CALJIC 17.50).

The jury was given forms to indicate the following verdicts and findings: (1) guilty of murder, with a space for the jury to "fix the degree" at either first or second degree, and a space for the jury to indicate its finding on the weapon enhancement allegation; (2) not guilty of murder; (3) of voluntary manslaughter, "a lesser included offense as charged in Count One of the Information;" and (4) not guilty of voluntary manslaughter. *Omar*, 2019 WL 2635578, at *10. The jury returned the verdict form indicating its decisions that Omar was guilty of murder, fixed the degree at "first

11

degree," and found "true" the weapon enhancement allegation.  *Id.*  In response to the trial court's question directed at all the jurors, regarding whether, as read, the verdict was true and correct, the jury replied, "Yes."  *Id.*  Both the prosecutor and defense counsel waived the right to individually poll the jurors.  *Id.*

### 2.   Failure To Instruct On Lesser Included Offense

Omar contends that the trial court failed to properly instruct the jury on implied malice as a theory of second degree murder, and modified the voluntary manslaughter instruction to omit the implied malice theory.  Docket No. 1 at 6, 7.  He claims that the failure to instruct on a lesser included offense violated his rights under due process.  *Id.* at 8.

### a.   California Court Of Appeal's Decision

On direct appeal, Omar urged that he was entitled to a new trial because the trial court had a "*sua sponte* duty to instruct the jury on 'the implied malice theory of second degree murder' using CALJIC No. 8.31."  *Omar*, 2019 WL 2635578, at *11.  That instruction would have informed the jury: "Murder of the second degree is also the unlawful killing of a human being when:  [¶]  1. The killing resulted from an intentional act,  [¶]  2. The natural consequences of the act are dangerous to human life, and  [¶]  3. The act was deliberately performed with knowledge of the danger to, and with conscious disregard for, human life. When the killing is the direct result of such an act, it is not necessary to establish that the defendant intended that the act would result in the death of a human being."  *Id.* (quoting CALJIC 8.31).  Omar also noted that when the trial court instructed the jury on voluntary manslaughter, the court used a modified version of CALJIC No. 8.40, and omitted language that would have allowed the jury to consider whether he had committed an unlawful killing "without malice aforethought" but with "conscious disregard for human life."  *Id.*  Omar argues that the given instructions "amounted to a directed verdict on the issue of intent, and constituted reversible error," stating as follows:

> [T]he omissions in the court's instructions were crucial to the jury's consideration of the issue of his intent to kill the victim, which "was very much in dispute.  [He] acknowledged that he stabbed [the victim], but repeatedly testified that he intended

1

only to hurt her.  If believed, such testimony supported a verdict of implied malice second degree murder.  As given, however, the instructions precluded jurors from crediting his defense theory of the case, leaving them with no option but to convict [him] of an intentional killing."

2

3

*Id.* (brackets added).

4

5

b.    Analysis Of Federal Constitutional Claim

6

A state trial court's refusal to give an instruction does not alone raise a ground cognizable in

7

a federal habeas corpus proceedings.  *See Dunckhurst v. Deeds*, 859 F.2d 110, 114 (9th Cir. 1988).

8

The error must so infect the trial that the defendant was deprived of the fair trial guaranteed by the

9

Fourteenth Amendment.  *See id.*

10

The omission of an instruction is less likely to be prejudicial than a misstatement of the law.

11

*See Walker v. Endell*, 850 F.2d at 475-76 (citing *Henderson v. Kibbe*, 431 U.S. at 155).  Thus, a

12

habeas petitioner whose claim involves a failure to give a particular instruction bears an "especially

13

heavy burden," because "[a]n omission or incomplete instruction is less likely to be prejudicial than

14

a misstatement of the law." *Henderson v. Kibbe*, 431 U.S. 145, 155 (1977).  The significance of the

15

omission of such an instruction may be evaluated by comparison with the instructions that were

16

given. *Murtishaw v. Woodford*, 255 F.3d 926, 971 (9th Cir. 2001) (quoting *Henderson*, 431 U.S. at

17

156); *see id.* at 972 (due process violation found in capital case where petitioner demonstrated that

18

application of the wrong statute at his sentencing infected the proceeding with the jury's potential

19

confusion regarding its discretion to impose a life or death sentence).  The failure of a state trial

20

court to instruct on lesser-included offenses in a non-capital case does not present a federal

21

constitutional claim.  *See Solis v. Garcia*, 219 F.3d 922, 929 (9th Cir. 2000).

22

In *Davis v. Ayala*, 576 U.S. 257 (2015), the Supreme Court held that a state court's

23

determination that a constitutional error was harmless under *Chapman v. California*, 386 U.S. 18

24

(1967) constitutes an adjudication on the merits that is subject to AEDPA deference.  Thus, habeas

25

relief is unavailable unless the state court applied *Chapman* in an objectively unreasonable manner.

26

*Id.* at 269.  In addition, "a prisoner who seeks federal habeas corpus relief must satisfy *Brecht* [*v.*

27

*Abrahamson*, 507 U.S. 619, 637 (1993)]," which requires a showing that the error had a substantial

28

and injurious effect on the verdict.  *Id.* at 270.  If the federal habeas court finds either that the state

United States District Court
Northern District of California

court's *Chapman* holding was reasonable or that the error was harmless under *Brecht*, it may stop there.

Here, the California Court of Appeal reasonably concluded that any instructional error was harmless under *Chapman* based on the overwhelming evidence that Omar intended to kill the victim, and the jury's finding that he acted with premeditation, deliberation, and express malice.  The state appellate court explained that contrary to Omar's arguments, "the record d[id] not demonstrate that the issue of his intent to kill the victim was a close one," stating as follows:

> While defendant testified that he only intended to hurt the victim, it is not disputed that defendant repeatedly struck the victim with great force using a knife and had previously threatened the victim.  The evidence was so strong that the jury found defendant had committed an intentional, premeditated, deliberate, first degree murder *with express malice aforethought* (CALJIC No. 8.30), necessarily rejecting his self-serving testimony denying any intent to kill the victim.  Accordingly, we conclude defendant's claim of prejudicial instructional error fails.

*Omar*, 2019 WL 2635578, at *11 (citing *People v. Coddington*, 23 Cal. 4th 529, 593 (2000) (court found omission of complete instructions on implied malice second degree murder was harmless error where evidence of intent to kill was overwhelming and, under properly given instructions, the jury found killings were intentional, premeditated, and deliberate)).

A review of the record shows that the state appellate court applied *Chapman* in an objectively reasonable manner based on the strong evidence showing that Omar intended to kill the victim. Before the stabbing, Omar called and texted the victim numerous times.  2RT 273, 279, 285, 288-300.  The last few texts included the following threats to the victim: "Payback is coming hard," "Change your mind before it's too late," and "I will make all go away soon. You will go with me. No one will have you." 2RT 295, 297.  In addition to his texts, the evidence showed that Omar went to face the victim at the store where she worked armed with an eight-inch chef's knife concealed in his jacket.  2RT 301-303, 310.  The size and type of knife Omar chose to bring with him contradicts his claims that that he intended only to hurt the victim.  2RT 310-311.  The video evidence of the stabbing further contradicts such a claim and instead depicts actions showing an intent to kill the victim: Omar grabbed hold of the victim's shoulder and stabbed the victim repeatedly in her chest and abdomen before his brother was able to step in between them.  Docket No. 12-5 (People's Ex. 5 (video file of camera 7, beginning around 1.04.44 mark)).  Specifically, the force with which Omar

repeatedly stabbed the victim, his targeting vital areas of her body, and his attempts to hold onto the knife while wrestling with his brother amounted to additional evidence that Omar meant to do more than just hurt the victim.  1RT 213-214, 217-226.  The state appellate court also reasonably concluded that any instructional error regarding implied malice was harmless in light of the jury's finding that Omar not only had an intent to kill, but he also acted willfully and with premeditation and deliberation, which distinguishes first degree from second degree murder.  *See Omar*, 2019 WL 2635578, at *11.

The California Court of Appeal reasonably applied *Chapman* to conclude that any instructional error was harmless.  Omar therefore is not entitled to the writ of habeas corpus on this claim.

3.     Failure To Properly Instruct The Jury On The Requirement Of Reaching Unanimous Agreement On The Degree Of Murder

Omar contends that the trial court committed reversible error by instructing the jury using CALJIC No. 8.74, which advised the jurors that they had a duty to "agree unanimously" as to the degree of murder, but they did not have to unanimously agree on the "theory of guilt."  Docket No. 1 at 10-15.  He claims that the latter language may have confused the jurors by allowing them to believe that they did not need to unanimously agree on whether he was guilty of first or second degree murder.  *Id.* at 11.

a.     California Court Of Appeal's Decision

The state appellate court found that there was no reasonable likelihood the jurors would have misunderstood CALJIC No. 8.74 in the manner suggested by Omar, stating as follows:

CALJIC No. 8.74 correctly instructs the jury on the applicable law, namely, that "jurors need not unanimously agree on a particular theory of liability in order to reach a unanimous verdict."  (*People v. Sattiewhite* (2014) 59 Cal.4th 446, 479, 174 Cal.Rptr.3d 1, 328 P.3d 1; see *People v. Jenkins* (2000) 22 Cal.4th 900, 1024-1025, 95 Cal.Rptr.2d 377, 997 P.2d 1044 ["'[n]ot only is there no unanimity requirement as to the theory of guilt, the individual jurors themselves need not choose among the theories, so long as each is convinced of guilt'"].)  Defendant complains, however, that "when jurors are presented with a single theory of first degree murder and a single theory of second degree murder," the courts have held that "it is reversible error to instruct jurors with pattern instructions that they need not agree on the 'same

United States District Court
Northern District of California

theory' of guilt since jurors may confuse that phrase with the degree of murder," citing to *People v. Sanchez* (2013) 221 Cal.App.4th 1012, 164 Cal.Rptr.3d 880 (*Sanchez*), and *People v. Johnson* (2016) 243 Cal.App.4th 1247, 197 Cal.Rptr.3d 353 (*Johnson*). The cases cited by defendant are factually distinguishable, and, do not support his claim that the use of CALJIC No. 8.74 in this case was erroneous.

*Omar*, 2019 WL 2635578, at *12.

In *Sanchez*, the defendant was charged with murder on two distinct theories of aiding and abetting: first degree felony murder, and second degree murder on a natural and probable consequences theory. *See* 221 Cal. App. 4th at 1014. In response to a jury question, the trial court in *Sanchez* instructed the jury with former CALCRIM No. 548, which stated in part, "You may not find the defendant guilty of murder unless all of you agree that the People have proved that the defendant committed murder under at least one of these theories. You do not all need to agree on the same theory." *Id.* at 1019 (italics omitted). Because in *Sanchez* each degree of murder was supported by a single theory of guilt, the state appellate court found that this language may have misled the jury to believe that it did not need to reach a unanimous conclusion as to the degree of murder for which the defendant was liable. *Id.* at 1025; accord *Johnson*, 243 Cal. App. 4th at 1278. In response to *Sanchez* and *Johnson,* the last sentence of former CALCRIM No. 548 was revised in February 2016, to state, "You do not all need to agree on the same theory [, but you must unanimously agree whether the murder is in the first or second degree]." *See* CALCRIM No. 548 (revised Feb. 2016).

The California Court of Appeal pointed out that the trial court in the instant matter instructed the jury with CALJIC No. 8.74, the language of which differs from the version of CALCRIM No. 548 given in *Sanchez* and *Johnson*. *Omar*, 2019 WL 2635578, at *12. The state appellate court concluded that CALJIC No. 8.74 "makes it clear that the jury must 'agree unanimously' as to the degree of murder before returning a verdict, regardless of the particular theory relied on by the People." *Id.* The state appellate court further concluded that the "record g[ave] no indication of a reasonable likelihood that the jury applied the instructions given it in a legally improper manner." *Id.* at *13 (citations omitted). Finally, the state appellate court pointed out that during deliberations, the jury's notes to the trial court did not request any clarification of the instructions. *Id.*

b.      Analysis Of Federal Constitutional Claim

To obtain federal collateral relief for errors in the jury charge, a petitioner must show that the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process. *See Estelle v. McGuire*, 502 U.S. 62, 72 (1991); *Cupp v. Naughten*, 414 U.S. 141, 147 (1973); *see also Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974) ("'[I]t must be established not merely that the instruction is undesirable, erroneous or even "universally condemned," but that it violated some [constitutional right].'"). The instruction may not be judged in artificial isolation, but must be considered in the context of the instructions as a whole and the trial record. *See Estelle*, 502 U.S. at 72. In other words, the court must evaluate jury instructions in the context of the overall charge to the jury as a component of the entire trial process. *United States v. Frady*, 456 U.S. 152, 169 (1982) (citing *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977)); see, e.g., *Middleton v. McNeil*, 541 U.S. 433, 434-35 (2004).

In reviewing an ambiguous instruction, the inquiry is not how reasonable jurors could or would have understood the instruction as a whole; rather, the court must inquire whether there is a "reasonable likelihood" that the jury has applied the challenged instruction in a way that violates the Constitution. *See Estelle*, 502 U.S. at 72. In order to show a due process violation, the defendant must show both ambiguity and a "reasonable likelihood" that the jury applied the instruction in a way that violates the Constitution, such as relieving the state of its burden of proving every element beyond a reasonable doubt. *Waddington v. Sarausad*, 555 U.S. 179, 190-191 (2009) (internal quotations and citations omitted). A "meager 'possibility'" that the jury misapplied the instruction is not enough. *Kansas v. Carr*, 136 S. Ct. 633, 643 (2016) (quoting *Boyde v. California*, 494 U.S. at 380).

A determination that there is a reasonable likelihood that the jury has applied the challenged instruction in a way that violates the Constitution establishes only that an error has occurred.[4] *See Calderon v. Coleman*, 525 U.S. 141, 146 (1998). If an error is found, the court also must determine that the error had a substantial and injurious effect or influence in determining the jury's verdict, *see*

---

[4] A "reasonable likelihood" is lower than the "more likely than not" standard but higher than a mere "possibility." *Polk v. Sandoval*, 503 F.3d 903, 910 (9th Cir. 2007), *overruled in part by Babb v. Lozowsky*, 719 F.3d 1019, 1028-30 (9th Cir. 2013).

1    *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993), before granting relief in habeas proceedings. *See*

2    *Calderon*, 525 U.S. at 146-47.

3        Here, Omar cited to state court cases (*Sanchez* and *Johnson*) to support his claim of jury

4    instructional error.  Docket No. 1 at 11.  However, the California Court of Appeal reasonably

5    concluded that *Sanchez* and *Johnson* were inapplicable to this case because those cases interpreted

6    a different standard jury instruction—former CALCRIM No. 548.  *Omar*, 2019 WL 2635578, at

7    *12.   The state appellate court's determination that those cases and CALCRIM No. 548 had no

8    application to Omar's case may not be revisited on federal habeas.  *See Estelle*, 502 U.S. at 67-68

9    ("it is not the province of a federal habeas court to reexamine state-court determinations on state-

10   law questions"); *Mendez v. Small*, 298 F.3d 1154, 1158 (9th Cir. 2002) ("A state court has the last

11   word on the interpretation of state law.").  Even if such determinations were reviewable, the state

12   appellate court's conclusion was reasonable.

13       The California Court of Appeal reasonably determined that there was nothing in the record

14   that indicated the jury was confused by CALJIC No. 8.74.  *Omar*, 2019 WL 2635578, at *13.   The

15   state appellate court pointed out that during deliberations, the jury's notes to the court did not request

16   any clarification of the instructions; the notes only requested one exhibit and two readbacks of

17   Omar's testimony.  *Id.*

18       The California Court of Appeal also reasonably concluded that there was no indication in

19   the record that the jury would have misunderstood the language that unanimity was required as to

20   the degree of murder.  *Id.*  The record shows that during his closing argument the prosecutor made

21   clear that the jury had to agree unanimously as to the degree of the murder.  2RT 396-397 ("The

22   only way there can be first degree murder is if all 12 of you believe that the defendant intended to

23   kill [the victim] . . . and that there was willful deliberation with premeditation . . . .").  The prosecutor

24   also argued that the jury did not have to agree on the theory of malice for second degree murder,

25   thereby giving the jurors an explanation for the instructional language Omar challenges:

26       [T]o convict the defendant of murder in the second degree . . . the 12 jurors need to
         unanimously agree that there was malice.  You don't all have to agree which type of
27       malice it was.  If six of you think that he intended to kill her and six of you think that
         he did something that is naturally dangerous to human life and he did it anyway, and
28       that's implied malice.  As long as the 12 of you agree that he committed murder,

> meaning that there was malice, then you can find him guilty of murder.  All right.
> You don't have to agree on the exact theory of malice.

2RT 395-396.  The state appellate court reasonably determined that, based on this clarification from the prosecutor, the jury would have understood the language that unanimity was not required as to theory to mean it did not have to agree, in the case of *second* degree murder, whether Omar harbored express or implied malice.  *Omar*, 2019 WL 2635578, at *13; *see also Middleton v. McNeil*, 541 U.S. at 438 (arguments of counsel may clarify instruction for jury).

Because there is no reason to believe that the jury misapplied the jury instruction CALJIC No. 8.74, the California Court of Appeal's rejection of this claim was not contrary to, or an unreasonable application of clearly established federal law.  Omar is not entitled to the writ on this claim.

B.      Claims For Ineffective Assistance Of Trial Counsel

Omar contends that trial counsel provided ineffective assistance of counsel.  Dkt 1 at 15-32. Specifically, Omar alleges that trial counsel performed deficiently in that counsel: (1) did not present expert testimony about Omar's impaired mental functioning to negate deliberation, provocation, and intent to kill; and (2) did not object to the admission of a video taken from the police officer's body camera depicting that officer's performance of CPR on the dying victim.  *Id.*

The Sixth Amendment guarantees not only assistance, but the effective assistance, of counsel.  *Strickland v. Washington*, 466 U.S. 668, 686 (1984).  The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied upon as having produced a just result.  *Id.* In order to prevail on a Sixth Amendment ineffective assistance of counsel claim, a petitioner must satisfy a two-prong test.  First, he must establish that counsel's performance was deficient, i.e., that it fell below an "objective standard of reasonableness" under prevailing professional norms.  *Id.* at 687-88.  Second, he must establish that he was prejudiced by counsel's deficient performance; he must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Id.* at 694.  A reasonable probability is a

1    probability sufficient to undermine confidence in the outcome.  *Id.*

2         A "doubly" deferential judicial review is appropriate in analyzing ineffective assistance of

3    counsel claims under § 2254.  *See Cullen v. Pinholster*, 563 U.S. 170, 202 (2011).  The "question is

4    not whether counsel's actions were reasonable.  The question is whether there is any reasonable

5    argument that counsel satisfied *Strickland*'s deferential standard."  *Harrington v. Richter*, 562 U.S.

6    86, 105 (2011).

7         A lawyer need not file a motion or make an objection that the lawyer knows to be meritless

8    on the facts and the law.  *See Wilson v. Henry*, 185 F.3d 986, 990 (9th Cir. 1999) ("to show

9    prejudice under *Strickland* from failure to file a motion, [a petitioner] must show that (1) had his

10   counsel filed the motion, it is reasonable that the trial court would have granted it as meritorious,

11   and (2) had the motion been granted, it is reasonable that there would have been an outcome more

12   favorable to him."); *see also Rupe v. Wood*, 93 F.3d 1434, 1445 (9th Cir. 1996) (failure to take

13   futile action can never be deficient performance).

14        A court need not determine whether counsel's performance was deficient before examining

15   the prejudice suffered by the defendant as the result of the alleged deficiencies.  *See Strickland*, 466

16   U.S. at 697.

17        A difference of opinion as to trial tactics does not constitute denial of effective assistance,

18   *see United States v. Mayo*, 646 F.2d 369, 375 (9th Cir. 1981), and tactical decisions are not

19   ineffective assistance simply because in retrospect better tactics are known to have been available.

20   *See Bashor v. Risley*, 730 F.2d 1228, 1241 (9th Cir.), *cert. denied*, 469 U.S. 838 (1984).

21        The petitioner bears the burden of rebutting the strong presumption that strategic decisions

22   by counsel are reasonable, and the absence of evidence cannot overcome the presumption.  *Dunn v.*

23   *Reeves*, 141 S. Ct. 2405, 2410 (2021) (per curiam) (internal quotations omitted).

24

25        1.    <u>Trial Counsel's Failure To Introduce Expert Testimony</u>

26        Omar claims that trial counsel rendered ineffective assistance by failing to introduce expert

27   testimony about his impaired mental functioning.  Docket No. 1 at 15.

28

United States District Court
Northern District of California

a.      The Evidence And Instructions At Trial

Omar contends that in a case where his subjective state of mind was the pivotal issue in separating murder from manslaughter, trial counsel "failed to present experts who could educate the jury about [Omar's] culture, the mistreatment and physical abuse he endured while growing-up, his life-long impaired mental functioning, and his poorly-managed diabetes." *Id.*  Omar urges that "the experts would have explained how these conditions impacted [his] mental state, which was critical for the jury's decision as to whether he acted with malice or deliberation and clear premeditation." *Id.* at 16.

Furthermore, Omar claims that the record contains ample evidence that he was in a "dissociative state at the time of the stabbing, brought on by endocrinological dysfunction, impaired cognitive functioning or a combination of these and other psychiatric and medical disorders." *Id.* Omar testified that he was "mentally sick" upon learning about the victim's infidelity. *Id.* (citing 2RT 273, 300-302).  Omar testified that during the days leading up to the stabbing, he was "stressed out" and "out of [his] mind." 2RT 278.  On the morning of the stabbing he was "very sick," "shaky and pale," and vomiting.  2RT 302.  He had neither taken his insulin nor slept in the previous four days.  2RT 273, 302-303.  He testified that he "didn't remember stabbing [the victim], and his mind was 'blank.'"  2CT 308, 354-355.

Omar points out that defense counsel "seized on [Omar's] mental state" during closing arguments and urged the jury to find Omar not guilty of first degree murder.  Docket No. 1 at 16. Counsel described "[Omar's] action of wandering out of the store and telling the officer that he committed the stabbing," and argued, "Does that signal that he was completely cognizant of the reality of the situation?"  2RT 422.  Counsel "urged jurors to consider [Omar's] demeanor, highlighting witnesses['] testimony that [Omar] was in a 'daze' and 'emotionally flat.'"  2RT 422. Finally, counsel argued, "Does this signal somebody who is all there, somebody who is completely in touch with reality in the moment?  I don't know because I can't read minds, but it certainly gives me pause as to what his mental state was at the time."  2RT 422.

Omar argues that "there is ample information in the record that [his] mental functioning was compromised at the time of the offense."  Docket No. 1 at 17.  Omar points to his defense sentencing

memorandum, which indicated that he suffered from untreated depression for decades as well as an unknown seizure disorder, and that was scarred for life when a local Shaman burned a hot iron into his skull without anesthesia.  *Id.* (citing 2CT 345, 347).  Omar adds that he was diagnosed with Type-II diabetes, but he "failed to properly manage the disease."  *Id.*

Omar claims that defense counsel was "aware that [Omar's] mental state at the time of the offense was at issue."  *Id.*  Prior to trial, counsel "sought authorization for [Omar] to be assessed for an insanity plea."  *Id.* (citing 2CT 218).  However, the record is not clear as to the results of that evaluation or whether an expert was appointed.  *See* 2CT 222.

### b.   California Court Of Appeal's Decision

The California Court of Appeal rejected Omar's claim of ineffective assistance of counsel for failure to introduce expert testimony:

> We conclude this case is "the usual one" in which the record does not shed light on why trial counsel opted not to present expert testimony.  (*People v. Weaver* (2001) 26 Cal.4th 876, 926.)  "'When . . . the record sheds no light on why counsel acted or failed to act in the manner challenged, the reviewing court should not speculate as to counsel's reasons. . . .'"  (*People v. Lucero* (2000) 23 Cal.4th 692, 728-729.)  "'To engage in such speculations would involve [us] . . .  "'in the perilous process of second guessing.'"'"  (*People v. Pope* (1979) 23 Cal.3d 412, 426, overruled on another ground in *People v. Berryman* (1993) 6 Cal.4th 1048, 1081, fn. 10.)  Accordingly, defendant's claim of ineffective assistance based on counsel's failure to present expert testimony fails.  The cases cited by defendant are factually distinguishable and do not require a different outcome.

*Omar*, 2019 WL 2635578, at *5.

### c.   Analysis Of Federal Constitutional Claim

In considering whether the state court violated clearly established federal law when it rejected Omar's claim that his trial counsel should have hired an expert, this court owes deference to both counsel *and* the state court.  *See Dunn*, 141 S. Ct. at 2410.  As to counsel, the United States Supreme Court explained that strategic decisions—including whether to hire an expert—are entitled to a "strong presumption" of reasonableness.  *See id.*; *Harrington*, 562 U.S. at 104.  Defense lawyers

22

have "limited" time and resources, and so must choose from among "'countless'" strategic options. *Harrington*, 562 U.S. at 106-107. Such decisions are particularly difficult because certain tactics carry the risk of "harm[ing] the defense" by undermining credibility with the jury or distracting from more important issues. *Id.* at 108. "The burden of rebutting this presumption rests squarely on the [petitioner], and it should go without saying that the absence of evidence cannot overcome it." *See Dunn*, 141 S. Ct. at 2410 (internal quotation marks and citation omitted).

"[E]ven if there is reason to think that counsel's conduct 'was far from exemplary,' a court still may not grant relief if '[t]he record does not reveal' that counsel took an approach that no competent lawyer would have chosen." *Id.* (citation omitted). This analysis is "doubly deferential" when, as here, a state court has decided that counsel performed adequately. *Id.* (citation omitted).

This court finds that Omar has not shown deficient performance by trial counsel for failing to call an expert witness. The state appellate court reasonably found that Omar's argument fails because the record "does not shed light on why trial counsel opted not to present expert testimony." *Omar*, 2019 WL 2635578, at *5. Furthermore, Omar does not identify who this expert would be nor does he provide a declaration from an expert that plainly states what the testimony would have been at trial. Finally, even considering Omar's claim that he suffered from untreated depression and an unknown seizure disorder, such scarce evidence would not have put trial counsel on notice that a further investigation and formal consultation with an expert witness might be fruitful to Omar. Thus, it cannot be said that trial counsel had no possible reason for his decision. *See Pinholster*, 563 U.S. at 196.

As the Supreme Court recently explained in *Dunn v. Reeves*, a state court is "entitled to reject [a defendant's] claim if trial counsel had any 'possible reason for proceeding as they did.'" 141 S. Ct. at 2412 (quoting *Pinholster*, 563 U.S. at 196 (alterations omitted)). And, because on the record here trial counsel did not have a particularly strong case to present through an expert, this court cannot find that "every 'fairminded juris[t]' would agree that every reasonable lawyer would have made a different decision." *Id.* at 2411 (quoting *Harrington*, 562 U.S. at 101). Thus, established Supreme Court precedent precludes habeas relief in this case based on trial counsel's failure to call an expert. *See Dunn*, 141 S. Ct. at 2410 (state court unreasonably found that petitioner had overcome

presumption that attorneys' strategic decision not to call an expert was reasonable where petitioner had presented no evidence that decision was unreasonable, such as attorneys' testimony about their decision-making ); *see also Wilson*, 185 F.3d at 990 ("A decision not to pursue testimony by a psychiatric expert, when no mental state defense seems likely, is not unreasonable under *Strickland.*"), *Williams v. Calderon*, 52 F.3d 1465, 1471 (9th Cir. 1995) (holding that there was no ineffective assistance from failure to hire psychiatrist where there was no evidence that defendant not sane).

Lastly, Omar fails to demonstrate how this expert testimony would have changed the outcome of his trial. Without such evidence, Omar cannot satisfy his burden of showing prejudice under *Strickland*. *See Bible v. Ryan*, 571 F.3d 860, 871 (9th Cir. 2009) (where petitioner contended he might have some type of organic brain dysfunction or disorder but offered no expert declaration that he in fact suffered from it, such speculation is not sufficient to establish prejudice). Based on the strength of the prosecution case, Omar cannot show a reasonable probability of a more favorable verdict had counsel presented expert testimony about Omar's impaired mental functioning.

Applying the "'highly deferential' look at counsel's performance," through § 2254(d)'s already "'deferential lens,'" *Pinholster*, 563 U.S. at 190, it cannot be said that the California Court of Appeal's rejection of Omar's ineffective assistance of counsel claim relating to the failure to call an expert witness was contrary to or an unreasonable application of *Strickland*, *id.* at 202. The state appellate court's analysis presents a "reasonable argument that counsel satisfied *Strickland*'s deferential standard," and that is sufficient to bar relief under § 2254(d). *See Harrington*, 562 U.S. at 105. Omar is not entitled to the writ on this claim.

2.  Trial Counsel's Failure To Object To The CPR Video; And His Mentioning CPR Video During Closing

Omar next claims that trial counsel was ineffective for failing to object to the admission of the CPR video, and this error was compounded by counsel's mentioning of the video in his closing argument. Docket No. 1 at 26-32. Omar urges that the "disturbing and graphic video and audio depicting the final moment of this young woman's life had no conceivable relevance to any issue at

trial." *Id.* at 27.  Omar contends that the record shows that the parties stipulated to the victim's identity, and the prosecutor introduced multiple autopsy photos depicting her injuries.  *Id.* (citing 2RT 384, People's Exs. 3-20, 3-23, 3-25, 3-26, 3-28, 3-29); *see also* 1RT 220-229 (testimony of medical examiner); *see also* Docket No. 12-9 at 62-67 (photographs from autopsy).  In addition, there was autopsy testimony which described in detail the precise nature and location of the wounds. Docket No. 1 at 27-28 (citing 1RT 217-225).  Omar claims that the video "failed to meet the most basic relevance threshold of the Evidence Code." *Id.* at 28 (citing Cal. Evid. Code § 352[5]).  Finally, Omar adds that "[a]ssuming the video had minimal relevance, its prejudicial effect far outweighed any probative value." *Id.*

Second, Omar claims that "counsel ensured that the disturbing video would have a devastating and lasting effect on jurors by arguing that 'it evoked a strong emotional response' and urging them to put themselves in the role of first responders." *Id.* at 32 (citing 2RT 419-420).  And thus, Omar argues that counsel's failure to object to the CPR video and "argument that emphasized its damaging emotional impact, was 'sufficient to undermine confidence in the outcome' of the trial." *Id.* (citing *Strickland*, 466 U.S. at 694).

### a.  The Evidence At Trial

The California Court of Appeal described the facts of this case as follows:

> As part of the prosecution's case in chief, the trial court admitted into evidence, without objection, a video taken from a police officer's body camera depicting the officer's performing CPR on the dying victim (CPR video).  In his opening brief, defendant describes the CPR video as "a two minute, 25 second video from [the officer's] body camera providing a first-person view of him giving CPR to the dying [victim].  [The officer] can be heard urging [the victim] to breathe and to 'stay with me, stay with me, stay with me.'"

*Omar*, 2019 WL 2635578, at *6.  As mentioned, trial counsel failed to object to the CPR video and instead referred to the video in his closing argument, as explained by the state appellate court:

---

[5] "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." Cal. Evid. Code § 352.

United States District Court
Northern District of California

Defense counsel argued to the jury that the key issue was defendant's mental state at the time he committed the killing. In resolving that key issue, defense counsel urged the jurors "to keep in mind as you head into deliberation in this case, important things. [¶] One of the things in this trial that struck me . . . it evoked a strong emotional response was watching the [CPR] video of [the police officer]. This was the first-person perspective of him performing CPR on [the victim]. And there's something about that first-person perspective that I think really brings the viewer, myself, you the jury, really into that moment. And it impressed upon me the difficulty that first responders have in their jobs. The difficulty being that they have a job to do, and it is emotionally charged, and there are a million distractions surrounding them and they are required to perform this almost super-human feat of ignoring the emotional moment and just doing their job. [¶] I would submit to you, ladies and gentlemen, that that is what a jury is also required to do. Because if this was a question of how emotionally charged, how outrageous this case is, I would have nothing to say to you frankly. That's not the law. That is not our system. The role of the jury, the job of the jury is to first ascertain what the facts, what has been proven beyond a reasonable doubt, what hasn't, and of those facts how much weight are we going to give to that evidence. And then the job of the jury is to apply the law that [the trial court] will give to you to the facts as you find them. [¶] So again, the central issue in the case is one of mental state. . . . It's not a question of what he did, it's why he did it. What was his intention? What was going on in his head at that moment?"

*Id.* at \*7; *see also* 2RT 420-21, 427.

b.      California Court Of Appeal's Decision

The California Court of Appeal rejected Omar's ineffective assistance of counsel claim for failing to object to the CPR video based on the record provided. *Omar*, 2019 WL 2635578, at \*6-8. The state appellate court wrote:

Defendant contends trial counsel was deficient for failing to object to the CPR video because the trial court would have certainly sustained the objection on the grounds the video was irrelevant and unduly prejudicial. However, "'[a]s a rule, the prosecution in a criminal case involving charges of murder or other violent crimes is entitled to present evidence of the circumstances attending them even if it is grim.' [Citation.]" (*Thomas, supra*, 53 Cal.4th at p. 806, 137 Cal.Rptr.3d 533, 269 P.3d 1109.) It is well settled that graphic evidence in a murder trial is not "rendered 'irrelevant or inadmissible simply because [it may] duplicate testimony, depict uncontested facts, or trigger an offer to stipulate.' [Citation.]" (*Thomas, supra*, at p. 806, 137 Cal.Rptr.3d 533, 269 P.3d 1109; *see People v. Milan* (1973) 9 Cal.3d 185, 193-194, 107 Cal.Rptr. 68, 507 P.2d 956 [court found no abuse of discretion in the admission of four photographs, two of which were in color, three of which showed deceased's bloodstained body slumped down in the cab, and a fourth which showed deceased's head with blood around his ear and face, despite defendant's claims that the photographs were admitted solely to inflame the jury, were gruesome and lacked probative value, the parties had stipulated as to the cause of death, and the defense presented was diminished capacity].) Contrary to defendant's contention, "[t]o the extent [the CPR video] used to illustrate the [police officer's] testimony may have been duplicative of testimony, it nevertheless had some value in helping the jury to understand the testimony or in corroborating the observations of witnesses." (*Thomas, supra*, at p. 807, 137 Cal.Rptr.3d 533, 269 P.3d 1109.) Thus, we cannot

agree with defendant that trial counsel could have successfully objected to the CPR video on the ground it was not relevant.

We also see no merit to defendant's argument that trial counsel could have successfully objected to the CPR video on the ground it was unduly prejudicial. Our Supreme Court has "'described the "prejudice" referred to in Evidence Code section 352 as characterizing evidence that uniquely tends to evoke an emotional bias against a party as an individual, while having only slight probative value with regard to the issues.' [Citation.]" (*Thomas, supra,* 53 Cal.4th at p. 807, 137 Cal.Rptr.3d 533, 269 P.3d 1109.) The CPR video, while extremely short, was undoubtedly gruesome, but defendant points to no evidence in the record that would support a finding that its admission "distract[ed] the jury from its proper function." (*Ibid.*) As our Supreme Court has "'observed, victim photographs and other graphic items of evidence in murder cases always are disturbing.' [Citation.] Nevertheless, absent evidence to the contrary, we may assume that the jurors were able to "'face [their] duty calmly and undismayed."' [Citation.]" (*Ibid.*)

In sum, even if an objection had been made at trial to the admission of the CPR video, the trial court would not have abused its discretion in admitting the evidence. The video's admission did not violate Evidence Code section 352 or deny defendant his constitutional right to a fair trial. "A motion to exclude such evidence under Evidence Code section 352 would surely have failed. [Defendant's trial] counsel did not perform deficiently for failing to make what would have been a meritless request." (*People v. Ochoa* (1998) 19 Cal.4th 353, 432, 79 Cal.Rptr.2d 408, 966 P.2d 442.)

*Id.* at *6-7. The California Court of Appeal was similarly "not persuaded by [Omar's] claim that the prejudice arising from the admission of the CPR video was compounded by his trial counsel's mentioning of the video in his closing argument," stating as follows:

Defendant contends his trial counsel's remarks regarding the CPR video were made to "ensure[ ] that the disturbing video would have a devastating and lasting effect on [the] jurors." We cannot agree. When the remarks are read in context, they would have had just the opposite effect. Trial counsel urged that, like first responders, the jurors had to set aside and not be swayed by the gruesome nature of the circumstances of the killing and instead perform their duties by evaluating the evidence according to the court's instructions and disregarding their emotional and visceral responses. Moreover, we see nothing in the record, and defendant cites nothing, in support of his further assertion that "[j]urors on the fence between the degree of murder, or as between murder and voluntary manslaughter, would have been swayed by the disturbing and irrelevant video of [the victim's] dying moments." The record shows that during deliberations, which spanned several hours over the course of two days, the jurors made no request to see the CPR video. However, they did ask to view the surveillance tape from the store and requested readbacks of portions of defendant's direct and cross-examination testimony. Thus, to the extent any inferences can be drawn from the record, it appears that the jurors acceded to defense counsel's request that they perform their duty to "dispassionately" evaluate the evidence before reaching their verdict.

*Id.* at *7.

c.    Analysis Of Federal Constitutional Claim

First, the California Court of Appeal reasonably determined that trial counsel's failure to

object to CPR video was not deficient performance because the evidence was admissible under state law. *Omar*, 2019 WL 2635578, at *6. Such determination of state law may not be revisited on federal habeas. *See Estelle*, 502 U.S. at 67-68; *Mendez*, 298 F.3d at 1158. Furthermore, the state appellate court reasonably concluded that any objection to such evidence would have been futile. *Omar*, 2019 WL 2635578, at *6-7. In reviewing a claim that counsel was ineffective for failing to raise an objection at trial, the merits of the underlying claim "control the resolution of the *Strickland* claim because trial counsel cannot have been ineffective for failing to raise a meritless objection." *Juan H. v. Allen*, 408 F.3d 1262, 1273 (9th Cir. 2005). The California Court of Appeal did not unreasonably apply *Strickland* in rejecting Omar's argument that trial counsel could have successfully objected to the CPR video on the ground it was unduly prejudicial. *Omar*, 2019 WL 2635578, at *6. Even if an objection had been made at trial to the admission of the CPR video, the state appellate court was reasonable in concluding that such an objection would not have been successful because the video's admission did not violate Evidence Code section 352 or deny Omar his constitutional right to a fair trial. *Id.* at *6-7. The state appellate court acknowledged that the CPR video was "undoubtedly gruesome," but pointed out that the video was "extremely short." *Id.* at *6. In rejecting Omar's claim, the state appellate court found that he "point[ed] to no evidence in the record that would support a finding that its admission "distract[ed] the jury from its proper function." *Id.* The record shows that the prosecutor placed no particular emphasis on the video, and, after it was admitted and shown to the jury, he did not play it again. 1RT 175-177.

Second, the California Court of Appeal was reasonable in finding that while defense counsel brought the CPR video up in closing, he referred to it in a way that had the beneficial effect to illustrate the point that the jurors, like first responders, needed to set aside their emotions and decide only the issue before them, i.e., what intent Omar harbored when he killed the victim. *Omar*, 2019 WL 2635578, at *7. The state appellate court was reasonable to point out that the jury seemingly followed this instruction, and did not request to have the video played again during deliberations, but rather focused on Omar's intent. *Id.*

Finally, there was no reasonable probability the jury would have returned a more favorable verdict had counsel objected and the CPR video not been shown, as the evidence of Omar's guilt

1    of first degree murder was overwhelming.

2          Applying the "'highly deferential' look at counsel's performance . . . through § 2254(d)'s

3    'deferential lens,'" it cannot be said that the California Court of Appeal's rejection of Omar's second

4    ineffective assistance of counsel claim relating to the CPR video was contrary to or an unreasonable

5    application of *Strickland*. *See Pinholster*, 563 U.S. at 190, 202.  The California Court of Appeal's

6    analysis presents a "reasonable argument that counsel satisfied *Strickland*'s deferential standard,"

7    and that is sufficient to bar relief under § 2254(d).  *See Harrington*, 562 U.S. at 105.  Accordingly,

8    Omar is not entitled to the writ on this claim.

9

10         C.     Cumulative Error

11         Omar contends that the cumulative effect of several errors warrants reversal.  Docket No. 1

12   at 32-34.  In some cases, although no single trial error is sufficiently prejudicial to warrant reversal,

13   the cumulative effect of several errors may still prejudice a defendant so much that his conviction

14   must be overturned.  *See Alcala v. Woodford,* 334 F.3d 862, 893-95 (9th Cir. 2003) (reversing

15   conviction where multiple constitutional errors hindered defendant's efforts to challenge every

16   important element of proof offered by prosecution).  "[T]he fundamental question in determining

17   whether the combined effect of trial errors violated a defendant's due process rights is whether the

18   errors rendered the criminal defense 'far less persuasive,' *Chambers* [*v. Mississippi*, 410 U.S. 284,

19   294 (1973)], and thereby had a 'substantial and injurious effect or influence' on the jury's verdict,

20   *Brecht*, 507 U.S. at 637."  *Parle v. Runnels,* 505 F.3d 922, 928 (9th Cir. 2007).  Here, there were

21   not multiple trial errors to accumulate.  Omar therefore is not entitled to relief under the cumulative

22   error doctrine.

23

24   D.     No Certificate Of Appealability

25         A certificate of appealability will not issue.  *See* 28 U.S.C. § 2253(c).  This is not a case in

26   which "reasonable jurists would find the district court's assessment of the constitutional claims

27   debatable or wrong."  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

28

United States District Court
Northern District of California

## CONCLUSION

For the foregoing reasons, the petition for writ of habeas corpus is DENIED. The clerk shall close the file.

**IT IS SO ORDERED**.

Dated: January 18, 2022

_____
SUSAN ILLSTON
United States District Judge